**Michael Charles Benson**
**Assistant Federal Public Defender**
michael_benson@fd.org
**C. Renée Manes**
**Assistant Federal Public Defender**
renee_manes@fd.org
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:   (503) 326-2123**
**Fax:   (503) 326-5524**

**Attorneys for Defendant**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:21-cr-00075-IM |
| Plaintiff, | **MOTION TO DISMISS COUNT ONE OF THE INDICTMENT** |
| v. | |
| **DANIEL MATTHEW KITTSON,** | |
| Defendant. | |

## I.   Introduction

Mr. Daniel Kittson, through his counsel, moves to dismiss Count One of the Indictment because any prohibition on the ownership and/or transfer of guns that have been labeled as 'machine guns,' by the government violates the core constitutional rights guaranteed by the Second Amendment.

Before, the United States Supreme Court decided *Heller v. District of Columbia* there was general confidence that the Second Amendment did not really mean that it says; that surely ordinary citizens do not really have a fundamental individual constitutionally protected right to possess firearms. 554 U.S. 570 (2008). Firearms after all are extremely dangerous. And amongst firearms, handguns may be the most dangerous variety of all, accounting for 59% of all firearm related murders in the United States.[1] Pew Research Center, "What the Data Says About Gun Deaths in the U.S."[2] At best the Constitution might protect "long guns" or rifles like the one in this case which account for only 3% of homicides. *Id*. There was a general sense—a sense unsupported by the text and history of the Second Amendment—that the Second Amendment could not be read like the other rights in the bill of rights and must belong to some other entity besides ordinary citizens. That confidence was misplaced. The Second Amendment it turned out protects the right of individuals to possess not just rifles, but bearable arms including handguns.

Following *Heller*, there was a general complacent confidence that the Second Amendment would still receive a fundamentally different test than every other constitutional right. Every circuit agreed. Similarly, courts frequently latched on to dicta in *Heller* using words like "longstanding" to justify denying Second Amendment protections under the notion that laws of a particular vintage must be constitutionally sound. But, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court clarified that every single circuit had it wrong. 142 S. Ct. 2111 (2022). The Second Amendment means what it says. When a statute is challenged as violating the Second Amendment,

---

[1] This statistic, if anything, understates the dangerousness of handguns as instruments of criminal violence. The next leading category of firearm involved in homicides is actually "type not stated." *Id*. In other words, of the homicides where the type of firearm was recorded 92% involved handguns. *Id*.

[2] Attached as Exhibit A.

**PAGE 2.   MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

the first question is whether the plain meaning of the Second Amendment—at the time it was passed—would have protected the conduct covered by the statute. Neither stray dicta nor policy considerations trump the plain meaning of the Second Amendment.

Following *Bruen*, and as discussed below, some courts are still expressing confidence that the Second Amendment does not protect fully automatic firearms. Statutes banning fully automatic firearms are widely popular. Automatic firearms are dangerous. Therefore, the Second Amendment surely cannot mean what is says when applied to automatic firearms.

That confidence is also misplaced. The Second Amendment means what it says. The constitution protects the right of ordinary citizens to keep and bear arms. Automatic firearms are bearable arms. In fact, almost any semi-automatic firearm can easily be turned into an automatic firearm. Firearms that can be made fully automatic include everything from the Ruger 10/22, the best-selling firearm in the United States, to ordinary handguns. Ex. B. Kits can be purchased for at little as $50 or printed from a 3D printer. Ex. B. These weapons whether semi-automatic or fully automatic are the successors of the state-of-the-art rifles ordinary Americans were once required to possess. They are consequently the exact kind of weapon the Second Amendment protects.

II.   **Argument**

   A.   **The Second Amendment means what it says and must be interpreted in historical context.**

The Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2126 (2022). *Heller* requires a particular methodological approach to the Second Amendment. Under that approach the Court must begin with an analysis of the text focused on the normal and ordinary meaning of the words. *Heller*, 554

U.S. at 576-77. This textual analysis is then informed by the historical context of the Second Amendment. *Id*. at 577.

What a court is not allowed to do is make a utilitarian calculation and decide what conduct the Second Amendment "should" cover. In particular, the Supreme Court "expressly rejected the application of any 'judge-empowering interest-balance inquiry[. . .]'" *Bruen*, 142 S. Ct. at 2129. The entire point of an amendment that protects individual rights is that it takes the issue of whether certain kinds of conduct should be regulated "out of the hands of government" including judges. *Id*. In other words, when the Second Amendment says it protects something, it actually protects it, and is not subject to a judicially created caveat that is not based on the text and history of the Second Amendment itself. *Id*.

The issue for a court is to determine whether the "Second Amendment's plain text" covers an individual's conduct. *Id*. at 2126. If it does, the government must show that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. Only if the government can affirmatively make that showing can the regulation survive. *Id*. Otherwise, the Court must find that the conduct is protected under the Second Amendment regardless of any interest balancing. *Id*.

Determining whether a challenged regulation is consistent with the Nation's historical tradition has a particularized meaning. It does *not* mean showing simply that a particular regulation is old. The challenged regulation in *Bruen* was over a hundred years old and yet was ultimately not consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2122 ("Today's licensing scheme largely tracks that of the early 1900s."). That is because the purpose of the "historical tradition" test is not to circumvent the plain meaning of the Second Amendment, but to augment it by placing it in historical context. *Id*. at 21129 ("*Heller's* methodology centered

**PAGE 4.   MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

on constitutional text and history"). The first source to consider when interpreting the Second Amendment are founding-era sources. *Id*. at 2128.

      **B.**      **Automatic rifles are arms under the Second Amendment.**

The plain text of the Second Amendment protects "the right of the people to keep and bear Arms." The legal question is relatively straightforward. Is an automatic rifle an "arm?" If it is, the Second Amendment presumptively protects the right to keep and bear it.

The "most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons." *Heller* 554 U.S. at 582. An automatic rifle is indisputably a weapon, it cannot be reasonably disputed that a person carrying an automatic rifle is "armed." As now, in the 18th Century "arms" included any bearable weapon whether offensive, or defensive including "all firearms . . ." *Id*. at 581 (citing J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1974)). *Heller*'s exhaustive review of founding-era sources confirmed that the "natural meaning" of bearing arms was identical to the meaning of bearing arms at the founding. *Id*.

The statute at issue here totally encumbers the right of any citizen to keep or bear automatic rifles. The statute straightforwardly makes it illegal for any American to "transfer or possess" automatic rifles excepting only a so called "grandfather clause" allowing owners to keep certain previously owned weapons. 18 U.S.C. § 922(o)(1). Thus, any automatic rifle made in the last approximately forty years is illegal. More to the point, the government alleges the World War II era rifle in this case is illegal for any citizen to keep or bear

The preliminary issue really is that straightforward. The Second Amendment protects the right to "keep" and "bear arms." Automatic rifles are arms. Therefore, they are protected by the

**PAGE 5.   MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

Second Amendment. It falls on the government to show that, nonetheless, banning automatic weapons fits within America's historical tradition of arms regulation.

C. **Neither dicta nor precedent that does not apply the correct legal standard may change the meaning of the Second Amendment.**

In *United States v. Henry*, the Ninth Circuit reached the opposite conclusion regarding automatic weapons. 688 F.3d 637 (2012). However, *Henry* did not apply the appropriate legal test as clarified by *Bruen* and should be viewed as overruled. In *Henry* the Ninth Circuit did not cite a single founding era law or perform any analysis of the historical tradition of firearms regulation in the United States. *Id*. at 639-40. Instead, the Court cited basic information regarding the dangerousness of machineguns. *Id*. at 639. Then, relying on dicta, the court summarily determined that machineguns are "dangerous" and "unusual" (words that appear nowhere in the text of the Second Amendment) and thus are not constitutionally protected. *Id*. at 640.

*Bruen* overruled the interest balancing approach employed by the Ninth Circuit in Second Amendment cases, citing Ninth Circuit precedent specifically in a footnote. *See Bruen*, 142 S.Ct. 2111, 2126 n.4 (citing *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (listing numerous circuit cases employing the standard being abrogated). The Ninth Circuit recently recognized that its Second Amendment test has been overruled. *United States v. Alaniz*, No. 22-30141, slip op. at 7-8 (9th Cir. June 13, 2023). Because the legal standard *Henry* employed has been abrogated, this Court should not view it as controlling authority. Further, it is hardly even persuasive authority as *Henry*'s consists of five scant paragraphs that cite no historical sources and making no attempt to square its reasoning with the text and history of the Second Amendment.

*Bruen* has also clarified *Heller's* three paragraphs which discuss possible limitations on the right to bear arms. *Heller* briefly discussed the possibility that "longstanding" prohibitions on the

PAGE 6. MOTION TO DISMISS COUNT ONE OF THE INDICTMENT

right to bear arms such as the ban on the possession of firearms by felons and the ban on automatic firearms could be squared with the text and history of the Second Amendment. *Heller*, 554 U.S. at 626-28. Neither felon in possession laws nor bans on automatic rifles were at issue in *Heller*. *Id*. *Bruen* has clarified the historical analysis for determining whether "longstanding" laws, like the New York statute *Bruen* analyzed are consistent with the text and history of the Second Amendment. If the plain text covers the conduct, then the government must show that the regulation is nonetheless consistent with the text and history of the Constitution, and that showing is not short-circuited by *Heller*'s dicta. *Bruen*, 142 S. Ct. at 226.

The Third Circuit recently came to precisely this conclusion with respect to firearms bans for felons. An *en banc* panel cautioned against "overread[ing]" *Heller*'s "longstanding" language as courts had previously overread other stray comments to justify means ends scrutiny. *Range*, 2023 WL 3833404 (3rd Cir. 2023) at *4. The court further noted that the ban on felons possessing firearms originated not at the founding, but in 1938, with the total ban not being enacted until 1961. *Id*. at *6. A law enacted "some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratifications—falls well short of 'longstanding'" in understanding the original meaning of the Second Amendment. *Id*.

The federal ban on fully automatic firearms at issue in this case is of no more ancient vintage. In fact, 18 U.S.C. § 922(o) was not enacted until 1986. Firearm Owners' Protection Act § 102, Pub. L. No. 99-308, 100 Stat. 449, 453 (1986). That is 195 years after the ratification of the Second Amendment and 118 years after the ratification of the Fourteenth Amendment. The ban also was not instituted until forty years after the manufacture of the firearm in this case, which dates to 1945.

**PAGE 7.   MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

Because the law in this case violates the plain text of the Second Amendment, the burden falls to the government to find a historical analogue. Mr. Kittson reserves the right to respond to such alleged analogues as they are presented. But, this Court should not view analogues that merely outlaw weapons because they are particularly suited to criminal conduct and unsuited to military service as relevant. *See*, *State v. DeCiccio*, 105 A.3d 165, 190-201 (Conn. 2014) (explaining the military origins of "Dirk Knives," holding them as protected under the Second Amendment and distinguishing them from items with mainly criminal uses like brass knuckles). A legal regime outlawing certain kinds of easily concealable knives because they are particularly suited to criminal conduct, but which allows citizens to possess state of the art rifles cannot be said to outlaw knives merely because they are deadly. *Id*. Instead, it outlaws weapons that are designed for a criminal purpose rather than ordinary militia service. *Id*. Machineguns are unquestionably deadly, but they are not designed for a criminal purpose. The firearm in this case, for example, was designed to serve the Russian Army in World War II.

"The past is a foreign country; they do things differently there." L. P. Hartley, The Go-Between 1 (3d ed. 2002). While restricting the purchase of automatic firearms might be a relatively uncontroversial policy choice today, the founders enacted the Second Amendment exactly to protect the right to keep and bear dangerous weapons against popular restraint. The Second Amendment's plain meaning, in context, protects the right to own fully automatic rifles including the rifle in this case. Nonetheless, federal law functionally bans ordinary Americans from owning them. It is impossible to square that total ban with the text and history of the Second Amendment. Unless the government can carry its burden of showing that ordinary Americans were restricted from purchasing state of the art rifles at the time of the founding, this court must dismiss the first count of the indictment.

**III.     Conclusion**

For all of the reasons presented herein, and to be presented in further briefing and argument to this Court, Mr. Kittson seeks dismissal of Count One of the Indictment because the law on which it is based violates the Second Amendment.

Respectfully submitted on June 30, 2023.

*/s/ Michael Charles Benson*
Michael Charles Benson
Assistant Federal Public Defender

*/s/ C. Renée Manes*
C. Renée Manes
Assistant Federal Public Defender
