**Michael Charles Benson**
**Assistant Federal Public Defender**
**michael_benson@fd.org**
**C. Renée Manes**
**Assistant Federal Public Defender**
**renee_manes@fd.org**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:    (503) 326-2123**
**Fax:   (503) 326-5524**

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:21-cr-00075-IM** |
| **Plaintiff,** | |
| | **REPLY TO GOVERNMENT'S** |
| **v.** | **RESPONSE TO MOTION TO** |
| | **DISMISS COUNT 1** |
| **DANIEL MATTHEW KITTSON,** | |
| **Defendant.** | |

The government's argument in opposition to Mr. Kittson's motion to dismiss conflates the "plain text" portion of the *Bruen* two-step analysis with the "historical tradition" portion. The government confuses what are at best predictions in dicta about how the historical tradition approach to the Second Amendment will fair in challenges to particular kinds of firearms with the plain text of the Second Amendment. Firearms regulations can be lawful despite infringing on the

right to possess arms if they are consistent with the historical tradition of firearms regulation. The government has the burden of establishing that tradition.

Here the government only identifies two historical analogues, Blackstone's description of the Statute of Northampton and a single North Carolina opinion that references restrictions on carrying arms in a manner that will naturally terrify the people. Both analogues turn out to be conduct based firearm restrictions. Neither are outright bans on particular kinds of firearms. They are not at all similar to the regulation in this case.

A.      **The Second Amendment still means what it says.**

The government's reply brief asserts that the plain text of the Second Amendment does not protect machineguns. What is missing from the argument is even a single sentence analyzing the actual words within the Second Amendment that would support this argument. The Second Amendment protects the right of "the people to keep and bear Arms." There are no words of qualification such as "typically possessed by law-abiding citizens for lawful purposes." Those words do not appear in the Second Amendment. They are not part of its plain text.

The issue of what those words mean has already been settled. "The second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). It is true that in, for example, *Heller* the Court discussed possible future litigation of historical limitations on that right including certain uses of weapons. *Id*. at 627. But neither *Heller* nor *Bruen* claimed those limitations were in fact part of the "plain meaning" of the Second Amendment. *Heller* did not explain how future courts were supposed to conduct that historical analysis. *Id*. *Bruen* specifically explained the two-part test and the historical methodology for analyzing firearm regulations. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) ("In

PAGE 2.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1

keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").

The Government even goes so far as to cite dicta in concurrences as if it were somehow part of the plain text of the Second Amendment. For example, the government seizes on a concurrence by Justice Kavanaugh in *Bruen* addressing an issue not before the Court in *Bruen* and discussing "the carrying of dangerous and unusual weapons." Gov't Response to Motion to Dismiss (ECF #45) at 4. The word dangerous is not in the Second Amendment, nor is the word unusual. As discussed in Part b, the historical laws addressing the carrying of dangerous and unusual weapons did not ban possession, but banned certain conduct with weapons.

What these citations actually discuss are the historical limitations on the Second Amendment, or the second step of the *Bruen* test. Under the second step of *Bruen*, the court looks for historical analogues to the challenged regulation. *Bruen*, 142 S.Ct. at 2126. The dicta the government cites reflects the justices' expectation that historical analogues will support regulation of certain kinds of firearms. No "dangerous and unusual" test has ever been employed by the Supreme Court to strike down any firearm regulation in any case, and the dangerous and unusual language is specifically a citation to Blackstone, which as discussed in Section b supports conduct-based firearms regulation.

The only actual weapon-based restriction the government cites in opposition is the short barrel shotgun in *United States v. Miller*, 307 U.S. 174 (1939). *Miller* references the importance of the militia during the Colonial and Early Republican historical eras. *Miller* did not uphold the ban short-barrel shotguns because they were dangerous. The word "unusual" never appears in *Miller*. Instead *Miller* upheld the short barrel rifle statute on this reasoning:

**PAGE 3.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1**

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Id*. at 178.

It is unclear how much of *Miller*'s militia focused reasoning survived *Heller*, but to whatever extent it does the same cannot be said of automatic rifles. Automatic rifles, as defined by statute, are "ordinary military equipment. . ."[1] The M4A1, an M16 derivative is the service weapon of United States infantrymen.[2] It capable of automatic fire.

As discussed in Mr. Kittson's original motion, the concern with short barrel shotguns and other instrumentalities of crime is not applicable to automatic rifles. The issue with a short barrel rifle is that shortening the barrel is useful not for legitimate military or militia use, but to conceal the weapon in furtherance of criminal activity. In other words, *Miller* is partly referencing laws banning the concealment of weapons which is a separate issue not presented in this case. *See Heller*, 554 U.S. at 613 (discussing concealed weapons).

**B.    The government cites a historical tradition of conduct-based arms regulation, not a tradition supporting weapons-based regulation.**

Because the plain text of the Second Amendment covers automatic rifles, the burden falls on the government to establish a historical tradition supporting the ban and the party presentation

---

[1] While the original version of the M16 was fully automatic, modern rifles are designed for three round bursts. Any firearm that fires more than one shot with a single trigger pull is a machinegun as that term is used in 18 U.S.C. § 922(o). 26 U.S.C. § 584(b).

[2] The United States Department of Defense has a convenient summary of the basic equipment of modern and historical soldiers available at https://www.defense.gov/Multimedia/Experience/Common-Threads/Common-Threads-Army/ (last accessed July 19, 2023).

principle applies. *See Bruen*, 142 S.Ct. at 2130 n.6 ("Courts are thus entitled to decide a case based on the historical record compiled by the parties."). The government relies primarily on a quote from Blackstone as a historical analogy for the ban on automatic rifles. Close scrutiny of the cited passage and its historical context shows that it does not discuss a ban on possessing or transferring certain kinds of weapons at all. The full quote from Blackstone reads as follows:

> The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c. 3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour. 4 Blackstone 148-49 (1769).

Even according to Blackstone, it was not illegal to possess "dangerous or unusual weapons." Instead "riding or going armed" with those weapons was a crime. Nothing prohibited the mere possession or transfer of dangerous weapons or the use of them to defend the home. What is more, Blackstone uses the disjunction "or," meaning a weapon is banned if dangerous alone. If Blackstone was sufficient for the government to ban any dangerous weapon, handguns would certainly qualify and *Heller* should have come out the opposite way.

Blackstone, of course, was a secondary source collecting and commenting on the laws. The statute Blackstone is referencing is the "Statute of Northampton," a 1328 statute enacted by Edward the II.[3] *Bruen*, 142 S.Ct. at 2139. It should be noted that Blackstone's commentary was

---

[3] The Statute of Northampton 2 Edw. 3, c. 3 (1328) (available at https://press-pubs.uchicago.edu/founders/print_documents/amendIIs1.html) read in full:

Item, it is enacted, that no man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor

written about for hundred and forty years after the Statute of Northampton. Put another way, today is about two centuries closer in time to the Bill of Rights' passage in 1791 than Blackstone was to the Statute of Northampton.

*Bruen* in fact thoroughly dismantles the notion that the Statute of Northampton is a valid historical reference for modern firearm regulation. First, because of its more than four and a half centuries of historical distance from the founding The Statute of Northampton "has little bearing on the second amendment adopted in 1791." *Id*. at 2139. Second, the statute was not an equivalent to a ban on modern arms. Instead, it banned going about wearing armor and carrying a launcegay which "were generally worn or carried only when one intended to engage in lawful combat or –as most early violations of the Statute show—to breach the peace." *Id*. at 2140. Finally, the statute did not ban the simple carrying of weapons but instead required showing that the arm was carried "with such Circumstances as are apt to terrify the people." *Id*. at 2142.  Historical sources suggest that by the time of the founding conviction under the common law concepts underlying both the Statute of Northampton and Blackstone required proof of "evil intent or malice." *Id*. at 2141.

In fact, when one reads the entirety of the Blackstone passage keeping in mind the actual history of the Statute of Northampton, it is consistent with this general theme. The statute was not part of a historical tradition of banning the owning, possessing, or even carrying of certain kinds

---

in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's justices in their presence, sheriffs, and other ministers in their bailiwicks, lords of franchises, and their bailiffs in the same, and mayors and bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables, and wardens of the peace within their wards, shall have power to execute this act. And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.

**PAGE 6.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1**

of weapons. It was a ban on carrying weapons so as to create a threat of lawless violence "by terrifying the good people of the land." The statute in this case does not require that the weapon terrify anyone. Put another way, the tradition the government relies on is more similar to modern assault statutes that generally ban things like pointing guns at others than it is to a total ban on a kind of weapon.

The government's other historical reference to *State v. Langford*, 3 Hawks. 381 (1824) reinforces this point. In *Langford* several men had "fired at the house of an unprotected female" and killed her dog. *Id* at 383. The indictment had been dismissed by the trial court on technical grounds of pleading. *Id*. The North Carolina Supreme court reversed the dismissal, finding that shooting at someone's house "does not require aid of the words 'with a strong hand'" to qualify as a "breach of the peace." *Id*. In passing, the court referenced the common law concept of carrying weapons "in such manner as will naturally cause a terror of the people." *Id*. *Langford* did not suggest that the kind of weapons the defendants possessed were banned. Rather their conduct with those weapons breached the peace. *Langford* is entirely consistent with the common law tradition explained in *Bruen* of banning conduct with weapons that will "naturally" incite terror and violence, conduct neither alleged in this case nor required by the statute challenged in this motion. *Bruen*, 142 S.Ct. 2139-42. Certainly shooting at someone's house qualifies as using weapons in a way that will "naturally" cause "terror of the people."[4]

---

[4] The government's briefing does not address whether it takes the position that fully automatic weapons place this case in the category of cases involving "dramatic technological changes" that "require a more nuanced approach." *Bruen*, 142 S.Ct. at 2132. The government has therefore waived this argument. Nonetheless, the historical tradition the government has identified of conduct-based firearm regulation is so dissimilar from the weapon-based regulation at issue in this case it would fail under either approach.

PAGE 7.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1

### C.    Automatic rifles are not "unusual."

As discussed in Section b, and in the original motion *Heller*'s dicta concerning dangerous and unusual weapons should not be overread and ultimately the question is not whether automatic rifles are dangerous or typical, but whether the statute as challenged in this case fits within the nation's historic tradition of firearm regulation. *See Bruen*, 142 S.Ct. at 2117 ("the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation."); *Range v. Attorney General*, 69 F.4d 96, 101 (3rd Cir. 2023) ("And while we heed that phrase, we are careful not to overread it as we and other circuits did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny."). Nonetheless, automatic rifles are not unusual. The government contends that automatic rifles are "unusual" because they are not currently in common use amongst civilians. This definition of "unusual" effectively serves as a grandfather clause protecting every firearm regulation enacted long enough to restrict the supply of a particular kind of weapon. Automatic rifles are illegal, which means that even those who own them have incentive to hide them. If *Heller* had intended its dicta regarding dangerous and unusual weapons to serve as a grandfather clause supporting any ban restricting the current supply of certain kinds of weapons it likely would have directly said so.

Really, the government's definition of "unusual" arms is a rehash of the argument that twentieth century firearms bans should be part of the "historic" tradition of firearms regulation in the United States. Any firearms regulation old enough will make the carrying or use of certain kinds of weapons "unusual." In New York it was *unusual* for ordinary civilians to go about the state armed with handguns (which are unquestionably dangerous) because that had been illegal for most citizens for a century. *Bruen*, 142 S.Ct. at 2122. Yet *Bruen* overturned that ban.

**PAGE 8.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1**

In fact, common semi-automatic firearms regularly sold and used in the United States are really just fully automatic weapons with the automatic feature disabled. All that separates a fully automatic Glock handgun from a semi-automatic Glock handgun is a $50 part easily purchased on the internet. The well-known AR15 rifle is really just a semi-automatic version of the M16, and can easily be modified back to being fully automatic. Thus any purchaser of a Glock, or AR15, or even a Ruger 10/22 has purchased a fully automatic weapon, modified to be legal by disabling that feature. And, as discussed previously automatic firearms are common in military service

Finally, in a footnote the government takes issue with the use of the phrase "automatic rifle," citing a Business Insider article to distinguish it from a "machinegun." Gov't Response to Motion to Dismiss (ECF #45) at n.2. The government erroneously suggests that 18 U.S.C. § 922(o) is "specific to machineguns." *Id*. If § 922(o) only banned "machineguns" as Business Insider defines them then the automatic rifle in this case would be legal.[5] Instead, however § 922(o) bans all fully automatic firearms, whether machineguns, submachineguns or automatic rifles like the one in this case. *See* 18 U.S.C § 921(o) (using the word machinegun); 18 U.S.C. § 921(a)(24); 26 U.S.C. § 584(b) (defining a machinegun as any weapon that shoots "automatically more than one shot . . ."); *United States v. Kuzma*, 967 F.3d 959, 967 (9th Cir. 2020) (explaining the meaning of the term "machinegun" in § 922(o)). The undersigned uses the word "automatic rifle" because the weapon in this case is an automatic rifle. The analysis might be different for other types of automatic weapons that might not, for example, be bearable arms.

---

[5] Machineguns are defined by the article as weapons that are large, heavy, belt fed, and have replaceable barrels. As such they would have a different Second Amendment analysis since it is debatable whether they are "bearable" arms. *See District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

**PAGE 9.   REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNT 1**

**Conclusion**

*Bruen* confirms that courts are to address the Second Amendment using a historically based methodology. History is interesting precisely because the answers it provides are not always what one expected. Nor are they always convenient. It would be convenient if historical sources revealed close analogues to the modern ban on automatic rifles given how popular those bans are. But, it was the government's burden to find such analogues and it could find nothing even remotely similar to the statute in this case. The motion should be granted, and the first count of the indictment dismissed.

Respectfully submitted on July 20, 2023.

/s/ Michael Charles Benson
Michael Charles Benson
Assistant Federal Public Defender

/s/ C. Renée Manes
C. Renée Manes
Assistant Federal Public Defender