NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
**NICOLE M. BOCKELMAN, OSB #105934**
Nicole.Bockelman@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:21-cr-00075-IM |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **DANIEL MATTHEW KITTSON,** | |
| **Defendant.** | |

On January 10, 2020, defendant sold a machinegun to an undercover ATF agent. After his arraignment in May 2021, he failed to comply with pretrial conditions, repeatedly used controlled substances, and eventually absconded supervision for a 3-month period prior to his arrest in September 2022. Law enforcement officers found him in possession of another firearm, drugs, and over $1,000. He went to trial and was convicted by a jury of illegally transferring a

**Government's Sentencing Memorandum**                                                                                                                              **Page 1**

machinegun. He has done nothing to earn a below-guideline sentence. This Court should impose a guideline sentence of 27 months' imprisonment followed by three years of supervised release.

## I.     Procedural Background

On March 9, 2021, a federal grand jury returned a two-count indictment charging defendant with (1) Illegal Possession and Transfer of a Machinegun, in violation of Title 18, United States Code, Section 922(o), and (2) Felon in Possession of a Firearm, in violation of Title 18, United States Code, Section 922(g). ECF No. 1. Defendant made his initial appearance on May 28, 2021 and a magistrate released him to pretrial supervision. Defendant violated those conditions multiple times by using drugs, failing to report to urinalysis testing, and leaving the District without permission. PSR ¶¶ 7-8. A warrant issued in June 2022.

In September 2022, Crook County Sheriff's Office deputies responded to a report of a suspicious person sleeping in a hammock on a property in Prineville, and they arrested defendant. During a search of his person and belongings, deputies found a Smith and Wesson MP 40, $1075, 4.29 grams of heroin, 6.54 grams of methamphetamine, marijuana, and mushrooms. PSR ¶ 50.

On August 22, 2023, the Court held a three-day jury trial. The jury returned a guilty verdict on Count 1 (Illegal Possession or Transfer of a Machinegun), and a not guilty verdict on Count 2 (Felon in Possession of a Firearm). ECF No. 124.

## II.    The Offense Conduct

In December of 2019, a confidential informant (CI) working with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) contacted ATF Special Agent (SA) Weber to report information related to an individual possessing and attempting to sell a machinegun. The CI

stated to SA Weber that the CI knows the potential seller as "Dan," and that "Dan" described the machinegun to the CI as a "Russian PPSH-41" that fires 900 rounds per minute.

The CI provided SA Weber with "Dan's" phone number, which was: (503) xxx-6386. The CI told "Dan" that the CI had a friend (ATF Undercover SA Weber) that was interested in purchasing the machinegun. "Dan" told the CI to give the "friend" Dan's number and to have the "friend" contact Dan.

SA Weber conducted a query of law enforcement databases for the above-listed phone number and found that Daniel Kittson was the listed subscriber. SA Weber also confirmed that defendant had felony convictions from 1998 for Attempted Murder, Felon in Possession of a Weapon and Manslaughter in the First Degree.[1]

On January 7, 2020, SA Weber placed a recorded phone call to (503) xxx-6386, the phone number for which Daniel Kittson is the listed subscriber. (Govt. Ex. 4). During that call, Daniel Kittson identified himself as Dan, and told SA Weber that he has a "Russian PPSH" for sale. Defendant identified the firearm as "fully automatic." Defendant stated that although he had not personally fired the weapon, he had seen it fired and confirmed the gun is "fully automatic." Defendant told SA Weber that he does not want to sell the firearm, but that he currently needs the money.

In the same phone conversation, defendant alluded to having a partner with a financial interest in the sale of the gun. Defendant told SA Weber that he had searched the internet and believed the firearm to be worth between $16,000 and $22,000. SA Weber responded that the prices defendant saw on the internet were for legally transferred machineguns with tax stamps,

---

[1] These crimes are too old to score any criminal history points.

**Government's Sentencing Memorandum**            **Page 3**

which was not the case with the sale proposed by defendant. Defendant said he would be willing to sell the firearm for no less than $8,000, but he hoped to get $10,000.

Defendant told SA Weber that he has access to a number of firearms that he would be willing to sell to SA Weber, and that he could come up with a list of firearms available for sale. Defendant asked SA Weber if there were specific guns that SA Weber was interested in purchasing. SA Weber told defendant that he takes the guns he buys in Oregon to resell in California for a profit, and told defendant that he likes "ARs, AKs, handguns and hard to find firearms like full autos and silencers." Defendant and SA Weber negotiated the price for the machinegun and agreed to discuss the transaction more in the future.

During their conversation, defendant described the machinegun he had for sale as "really simple. It breaks down real easy, real fast." He also said, "…the fucker will spit like 1,200 to 1,400 fuckin rounds a minute out," and "right in front of the trigger, it's pretty cool, because there's like a little fucking switch there, and you just hit it with your finger and go from single-shot to full-auto," and "it also takes a fucking drum clip, too."

On January 10, 2020, SA Weber placed a recorded phone call to defendant's cell phone number. (Govt. Ex. 6). Defendant and SA Weber agreed to meet later that day on January 10, 2020, so that SA Weber could buy the machinegun from defendant. Defendant told SA Weber to come to his house, and then they would drive to the residence of defendant's associate, where he stored the machinegun, to conduct the transaction. Defendant reiterated that he wanted to receive at least $10,000 for the machinegun but would not sell it for less than $8,000. Defendant told SA Weber that he would text SA Weber his address. SA Weber told defendant that he plans to trade the machinegun he purchased from defendant for cocaine. After the phone call, defendant texted SA Weber the following address: 4773 Raffon Dr S E., Salem, Or 97317. (Govt. Ex. 7).

**Government's Sentencing Memorandum**                                                                                              **Page 4**

On January 10, 2020, SA Weber arrived at defendant's address and met with defendant at his door. Their interaction while in the vehicle was captured by audio and video. (Govt. Exs. 9-11). SA Weber and defendant then entered the ATF undercover vehicle driven by SA Weber. Defendant directed SA Weber to the residence of his associate where the machinegun was stored. Defendant affirmed that the machinegun belonged to him and was being stored at the other residence. Defendant confirmed that he would not sell the firearm for less than $8,000.



Government Exhibit 013, Page 1

As SA Weber drove defendant, defendant told SA Weber to pull next to the driveway of the residence located at 2025 17th Street NE, Salem, Oregon. Defendant explained that the residence was a "tiny house" located on the rear of the property. After parking and exiting the undercover vehicle, defendant led SA Weber to the rear of the property, where SA Weber saw a small, single-room structure with all windows except one covered by plastic tarp. SA Weber saw an unknown adult male inside the structure, wearing jeans and no shirt. This person was later identified as R.B. (full name redacted). The portion of the January 10 transaction that took place outside SA Weber's vehicle was audio recorded (Govt. Ex. 10), but the video recording failed.

Defendant and SA Weber entered the structure and defendant introduced SA Weber to the man inside the structure, who identified himself as "Ray." SA Weber observed a black rifle

**Government's Sentencing Memorandum**

case and an AR-15 type of rifle inside the structure. SA Weber saw that the AR-15 type rifle was loaded with two "double-stacked" magazines, a scope and the markings, "Waterboard + instructor" along the left side of the lower receiver.

Defendant informed "Ray," who law enforcement later determined to be R.B., that SA Weber was there to purchase "the Russian." Ray retrieved the black rifle case, which he handed to SA Weber to examine. SA Weber opened the case and saw a Russian PPSh-41 type, 7.62 x 25mm machinegun. Based on SA Weber's knowledge, training and experience, the firearm appeared to be consistent with an authentic PPSh-41 machinegun.




SA Weber asked defendant and Ray where the "selector switch" was located on the firearm, and both men told SA Weber that the switch was at the front of the "trigger guard." They told SA Weber that by sliding the lever forward, he would put the gun into "full auto" fire, while sliding the lever to the rear is for semi-automatic fire. Based on SA Weber's knowledge, training, and experience, he knows this to be consistent with authentic PPSh-41 machineguns.

While in defendant's presence, SA Weber conducted a "field-test" on the PPSh-41 firearm to determine if it was a machinegun. SA Weber ensured the firearm was clear of ammunition and ammunition feeding devices, pulled the charging handle to the rear, which

**Government's Sentencing Memorandum** **Page 6**

locked the bolt in place. Based on SA Weber's knowledge, training, and experience, he knows that authentic PPSh-41 machineguns fire from the "open bolt" position. SA Weber conducted the "field test" with positive results, determining that the firearm appeared to function as a machinegun.

Defendant affirmed to SA Weber that the firearm was a machinegun on multiple occasions. SA Weber agreed to purchase the machinegun and asked if defendant and Ray were willing to negotiate the price further. Both men stated they were unwilling to negotiate the price from the previously discussed $8,000.00. SA Weber asked who he should pay for the gun, and defendant told SA Weber to give the money to Ray.

SA Weber retrieved approximately $8,000.00 in pre-recorded ATF Agent Cashier Funds (four individual stacks of $2,000), handed the money to Ray and told Ray to count the money. SA Weber saw Ray hand defendant two of the stacks, and the two men counted the money to verify the amount.

SA Weber asked Ray about the pistol that Ray was carrying in the small of his back tucked into his jeans. Ray said the gun was a Smith & Wesson model M&P 9, 9mm and retrieved a similar firearm from another rifle case. Ray and defendant told SA Weber that once the firearm is ready for sale, that they would reach out to SA Weber to let him know.

Ray agreed to contact SA Weber through defendant when Ray had additional firearms ready for sale. The group exchanged goodbyes and then defendant and SA Weber returned to the undercover ATF vehicle. SA Weber secured the firearm in the trunk of the vehicle and defendant briefly went back to the structure, and then returned to the car. Defendant entered the undercover car and SA Weber drove back to defendant's house. The portion of the events of January 10,

2020, that took place inside SA Weber's vehicle, is captured on audio and video recording. (Govt. Ex. 11).

While they were driving to defendant's house, SA Weber told defendant that SA Weber planned to trade the machinegun with other firearms for cocaine. During the car ride, defendant made multiple statements which included, "right now, I'm pretty much doing this (for a living)," "you can't fill the magazines fast enough when you fire them" and "that drum, it'll go through that drum like fucking nothing."

SA Weber arrived at defendant's house and parked the undercover car in front of his residence. The men exchanged goodbyes, and defendant entered his residence. SA Weber met other agents at a staging area, secured the machinegun and drum as evidence, and drove back to Portland.

SA Caleb Enk inspected the firearm for identifying markings and information. SA Enk observed an alphanumeric combination stamped on the trigger guard which read "CA01716" and saw the same number etched on the stock of the firearm. SA Enk observed that the firearm had numerous characteristics of being a Russian-made machinegun, model PPSh-41 and took multiple photos of the machinegun and drum magazine. SA Enk performed a function check of the firearm for full automatic firing capability and the firearm tested positive for the check. SA Enk noted there was a selector switch located in front of the trigger, inside the trigger guard. SA Enk pushed the switch forward and observed the switch appeared to change the firearm from semi-automatic firing to fully automatic firing ability. SA Enk conducted a query of the National Firearms Registration and Transfer Record (NFRTR) using the number "CA01716," the gun's serial number. SA Enk received a response confirming that the gun was not registered with the

NFRTR. SA Enk conducted a query of the NFRTR for defendant and Ray (R.B.), and neither Daniel Kittson nor Ray had any record of any firearm registration. (*See* Govt. Exs. 25-27).

On January 11, 2020, SA Weber received a text message from defendant's cellular phone. (Govt. Ex. 21). Defendant reiterated that he and Ray might have another PPSh-41 machinegun for sale in the near future. Defendant said he would put together a list of firearms that he will have available for sale to SA Weber. Defendant said that he also has access to numerous "special requests" in case SA Weber had any special requests for firearm purchases.

On June 25, 2020, and on July 17, 2020, defendant called SA Weber and explained that his friend Ray had died unexpectedly. (Govt. Exs. 23, 24). Defendant said that he believed he could obtain firearms that belonged to Ray to sell to SA Weber. Defendant said he recently obtained a Sig Sauer 9mm pistol and said he would continue to attempt to acquire firearms to sell to SA Weber.

In July 2020, ATF Chief Daniel Hoffman examined the Pistolet-Pulemyot Shpagina-41 (PPSh-41) sold by defendant to SA Weber. He measured the firearm and barrel, took note of its markings, and observed that the accompanying drum magazine appeared to be inoperable in its current condition. He test-fired the machinegun using a drum magazine from the National Firearms collection and commercially available ammunition. He determined that the firearm sold by the defendant is a weapon which shoots, automatically more than one shot, without manual reloading by a single function of the trigger when the selector is in the automatic position and incorporates the receiver of a machinegun. He concluded the firearm is a machinegun as defined in 26 U.S.C. §5845, that is: it shoots automatically, and is designed to shoot automatically, more than one shot without manual reloading by a single function of the trigger.

///

### III. Guideline Computations

The Probation Office prepared a presentence report, and the government agrees with the calculations therein. Defendant starts at a base offense level of 18 under U.S.S.G. § 2K2.1(a)(5) because the offense involved a restricted weapon described in 26 U.S.C. § 5845(a). PSR ¶ 28. Defendant has not clearly demonstrated acceptance of responsibility, and thus he did not earn a 3-level reduction for acceptance. PSR ¶¶ 26, 35. At TOL 18, criminal history category I, defendant's advisory guideline range is 27-33 months. The government recommends a low-end guideline sentence of 27 months' imprisonment, followed by a three-year term of supervised release.

### IV. Conclusion

The government recommends as a reasonable sentence under the 3553(a) factors a low-end sentence of 27 months' imprisonment and three years of supervised release. Such a sentence addresses the nature and seriousness of the offense, the background and characteristics of the offender, including his pretrial non-compliance with supervision and new law violations, and it is sufficient but not greater than necessary to accomplish the goals of sentencing.

Dated: November 29, 2023                    Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

*/s/ Leah K. Bolstad*
LEAH K. BOLSTAD, OSB #052039
NICOLE M. BOCKELMAN, OSB #105934
Assistant United States Attorneys